**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JEFFREY KARBASH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 1:16-cv-7973 |
| v. | ) ) | JURY TRIAL DEMANDED |
| SAGENT PHARMACEUTICALS, INC., ROBERT FLANAGAN, ALLAN OBERMAN, ANTHONY KRIZMAN, MARY TAYLOR BEHRENS, MICHAEL FEKETE, SHLOMO YANAI, NICHI-IKO PHARMACEUTICAL CO., LTD., and SHEPARD VISION, INC., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

**CLASS ACTION COMPLAINT FOR VIOLATION OF
SECTIONS 14(E), 14(D), AND 20(A)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This action stems from a proposed transaction announced on July 11, 2016 (the "Proposed Transaction"), pursuant to a tender offer (the "Tender Offer") whereby Sagent Pharmaceuticals, Inc. ("Sagent" or the "Company") will be acquired by Nichi-Iko Pharmaceutical Co., Ltd. ("Parent") and its wholly-owned subsidiary, Shepard Vision, Inc. ("Merger Sub," and together with Parent, "Nichi-Iko").

2.      On July 10, 2016, Sagent's Board of Directors (the "Board" or "Individual Defendants") caused Sagent to enter into an agreement and plan of merger (the "Merger

Agreement"). Pursuant to the terms of the Merger Agreement, stockholders of Sagent will receive $21.75 per share in cash.

3.        On August 1, 2016, defendants issued materially incomplete and misleading disclosures in the Solicitation/Recommendation Statement filed on Schedule 14D-9 (the "Solicitation Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Solicitation Statement is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

4.        Plaintiff alleges herein that defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement. **The Tender Offer is set to expire at 12:00 a.m. midnight, New York City time, on August 26, 2016.** Accordingly, plaintiff seeks to enjoin the closing of the Tender Offer unless and until defendants correct the materially incomplete and misleading disclosures in the Solicitation Statement as described herein.

## JURISDICTION AND VENUE

5.        This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6.        This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.        Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the

transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff Jeffrey Karbash is a resident of Delavan, Wisconsin, and has been continuously throughout all times relevant hereto, the owner of Sagent common stock.

9.      Defendant Sagent is a Delaware corporation and maintains its principal executive offices at 1901 N. Roselle Road, Suite 700, Schaumburg, Illinois 60195.  Sagent's common stock is traded on the NasdaqGS under the ticker symbol "SGNT."

10.      Defendant Robert Flanagan ("Flanagan") has served as a director of the Company since May 2009 and current serves as Chairman of the Board.

11.      Defendant Allan Oberman ("Oberman") has served as a director and Chief Executive Officer ("CEO") of the Company since September 2015.

12.      Defendant Anthony Krizman ("Krizman") has served as a director of the Company since July 2010.

13.      Defendant Mary Taylor Behrens ("Behrens") has served as a director of the Company since November 2010.

14.      Defendant Michael Fekete ("Fekete") has served as a director of the Company since July 2013.

15.      Defendant Shlomo Yanai ("Yanai") has served as a director of the Company since April 2015.

16.      The defendants identified in paragraphs 10 through 15 are collectively referred to herein as the "Individual Defendants."

17.      Defendant Nichi-Iko Pharmaceutical Co. Ltd. is a Japanese corporation and party to the Merger Agreement.

18.     Defendant Shepard Vision, Inc. is a Delaware corporation, a wholly-owned subsidiary of Nichi-Iko Pharmaceutical Co. Ltd., and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Sagent (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable. As of April 29, 2016, there were approximately 32,838,743 shares of Sagent common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

22.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

23.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be

dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

26.     Sagent is a leading provider of affordable pharmaceuticals to the hospital market, which the Company sells primarily throughout North America.

27.     Initially founded in 2006 as Sagent Holding Co., a Cayman Islands company, Sagent reincorporated as Sagent Pharmaceuticals, Inc. in connection with its initial public offering on April 26, 2011.

28.     With a primary focus on generic injectable pharmaceuticals, which provide customers a lower-cost alternative to branded products when applicable patents have expired or been declared invalid, or when the products are determined not to infringe the patents of others, Sagent offers its customers a broad range of products across anti-infective, oncology, and critical care indications in a variety of presentations, including single- and multi-dose vials and ready-to-use pre-filled syringes and premix bags.

29.     The Company generally seeks to develop injectable products where the form or packaging of the product can be enhanced to improve delivery, product safety, or end-user convenience.

30.     Sagent has rapidly established a growing and diverse product portfolio and product pipeline as a result of its innovative business model.

31.     On February 16, 2016, Sagent issued a press release wherein it reported its financial results for the fiscal year ended December 31, 2015.  The Company reported that net revenue for the fiscal year ended December 31, 2015 was $318.3 million, an increase of $29.3 million, or 10%, compared to $289.0 million in fiscal 2014.  Gross profit for fiscal 2015 was $87.7 million compared to $86.2 million in fiscal 2014.

32.     With respect to the results, Individual Defendant Oberman commented:

During my first full quarter with Sagent we have made significant progress in developing a robust plan to drive growth, enhance margins, and improve operating performance over the next several years[.] In addition to delivering solid fourth quarter financial results, we have committed to a strategy to support accelerated long-term growth and capitalize on the favorable market opportunities that we see as critical to long-term value creation.  As we move into 2016, our organization has a laser focus on executing against our "Triple E" growth strategy, which seeks to expand our product offerings, enhance our operational performance, and execute on M&A to ultimately drive long-term profitable growth for Sagent.

As part of our efforts to improve operating performance through reduced cost, we recently entered into the agreement to sell SCP to an important strategic partner. Nanjing King-Friend Biochemical Pharmaceutical Co. ("NKF"), has been an exceptional high quality and long-term partner of Sagent with deep experience operating under U.S. FDA requirements.  Their purchase of SCP will ensure continuity of supply of several key products and ongoing development support for several important strategic opportunities, while also providing significant cash savings for Sagent over the next several years that can be reinvested back in the business to support the continued expansion of the portfolio and investment in vertical integration in our Canadian operations.

33.     On June 16, 2016, the Company announced that it entered into a definitive agreement with Teva Pharmaceutical Industries Ltd. ("Teva") and Actavis LLC to acquire a portfolio of five Abbreviated New Drug Applications ("ANDAs") in the U.S. for $40 million. With respect to the agreement, Individual Defendant Oberman stated:

This agreement is a perfect example of the implementation of our 'Triple E' growth strategy, both expanding our product offering and executing a strategic acquisition[.] We have built a strong collaborative partnership with Teva over the past several years and we are pleased to secure these significant products for the future, given that Propofol was our second largest selling product by revenue in 2015. Importantly, because we have been distributing Propofol in conjunction with Teva, the agreement creates a seamless ownership transition for our customers.

Our unique business model is perfectly designed to facilitate such divestiture agreements. The depth of our development and manufacturing relationships, combined with our wide range of capabilities for a variety of configurations, and our ability to handle different types of products means we are able to quickly and successfully initiate transfer activities. We are excited to add these margin-enhancing assets to our robust portfolio and remain committed to pursuing similar accretive transactions as part of our 'Triple E' growth strategy.

### *Background of the Proposed Transaction*

34. According to the Solicitation Statement, in August 2014, the Board formed the Strategic Committee composed of three undisclosed members of the Board to facilitate the Board's review and evaluation of strategic opportunities that may arise from time to time.

35. In October 2014, Sagent engaged Perella Weinberg Partners LP ("Perella Weinberg") to assist the Board in identifying and evaluating potential strategic alternatives. In February 2015, Sagent engaged Morgan Stanley & Co. LLC ("Morgan Stanley") to further assist the Board in connection with evaluating potential strategic alternatives. The Solicitation Statement fails to disclose the reason the Board determined it was necessary to engage Morgan Stanley to perform the same exact duties that Perella Weinberg was hired to perform, including whether the engagement of Morgan Stanley was due to any perceived conflicts of interest on the part of Perella Weinberg. Notably, the Solicitation Statement does indicate that Individual Defendant Yanai, a member of the Board, is an independent advisor to Perella Weinberg. The Solicitation Statement, however, fails to disclose any further information about the nature and

extent of Yanai's relationship with Perella Weinberg or whether the Board even considered this potential conflict of interest and, if so, what steps were taken to mitigate this conflict.

36.     According to the Solicitation Statement, in the summer of 2015, representatives of an "international pharmaceutical company" indicated its interest in a potential business combination transaction with Sagent.  Further, between July 2015 and September 2015, "Party A submitted multiple non-binding expressions of interest to acquire Sagent at various indicative equity valuation ranges that reflected a premium to Sagent's then-current stock trading price." The Solicitation Statement, however, failed to disclose the terms of any of these expressions of interest.

37.     On October 26, 2015, Sagent and Party A entered into a confidentiality agreement, which included a standstill provision.  The Solicitation Statement fails to disclose whether this standstill provision, or any of the standstill provisions entered into by the Company during the process, contained a "don't ask, don't waive" ("DADW") provision that is or was preventing any of the counterparties from requesting a waiver of the standstill provision to allow those counterparties to submit a higher offer for the Company.  Notably, however, the confidentiality agreement that Sagent entered into with Nichi-Iko, which was filed as Exhibit (d)(3) to the Tender Offer Statement filed on Schedule TO, does in fact contain a preclusive DADW provision.

38.     On November 21, 2015, Party A submitted a non-binding proposal to acquire Sagent for an equity value of $900 million, which according to the proposal equated to approximately $27.45 per share.

39.     On January 13, 2016, *Reuters* ran a news story reporting that Sagent was considering a sale of the company as part of an exploration of strategic alternatives, and that

Perella Weinberg was representing Sagent in connection therewith. The Board instructed Perella Weinberg to advise any parties who might contact them regarding a transaction with Sagent that Sagent was not running a sale process, thus turning down potentially interested parties that could offer a higher value for the Company. The Solicitation Statement fails to disclose whether any parties (aside from Nichi-Iko) contacted Perella Weinberg or any other Company representative as a result of this news story to express interest in Sagent and, if so, how many parties were turned away.

40.     In early February 2016, "Party C" proposed to Sagent a merger into a new foreign corporation in a so-called "inversion" for U.S. federal tax purposes. On February 13, 2016, Sagent and Party C entered into a confidentiality agreement that contained a standstill provision. On February 25, 2016, Party C submitted to Sagent a non-binding proposal for a stock-for-stock transaction, with Sagent's and a new portfolio company's stockholders becoming stockholders of a new foreign corporation. The Solicitation Statement fails to disclose the value implied from this proposed transaction.

41.     On March 15, 2016, Eiichi Machida ("Machida"), a senior executive adviser of Nichi-Iko, indicated to Sagent that Nichi-Iko was interested in acquiring a majority stake of Sagent for cash, without specifying any price. Machida was subsequently informed that Sagent was only interested in an acquisition of the entire company.

42.     In early to mid-April 2016, the Strategic Committee determined to run a process to sell the Company and instructed Morgan Stanley and Perella Weinberg to contact potential parties that might be interested in acquiring Sagent. As a result of this process, the following indications of interest were provided to the bankers: Nichi-Iko offered between $18.00 and $20.00 per share; Party A offered $20.32 per share; Party C offered between $14.00 and $15.00

per share; Party D offered between $17.00 and $20.00; and "Party E" offered between $19.00 and $20.00 per share.

43.     Between late April and early May, Sagent entered into confidentiality agreements with Nichi-Iko, Party D, and Party E, each of which contained standstill provisions.  Again, aside from Nichi-Iko's confidentiality agreement, which was attached as an exhibit to the Schedule TO, the Solicitation Statement fails to disclose whether these standstill provisions contained DADW provisions that are or were preventing any of these counterparties from requesting a waiver of the standstill provisions to allow them to submit a higher offer for the Company.

44.     After receiving several revised proposals from various interested parties, on July 4, 2016, Party A submitted a proposal to acquire Sagent for an equity value of $725 million, which according to the proposal equated to approximately $21.50 per share.  The proposal also proposed to increase the reverse termination fee from 6% to 10% of the equity value of the proposed transaction.

45.     On July 10, 2016, Nichi-Iko submitted a proposal to acquire Sagent for $21.75 per share and required that Sagent not be allowed to waive the standstill provisions entered into by Sagent with other interested parties, therefore preventing any superior offers for the Company.

46.     On that same day, the Board abruptly met to consider Nichi-Iko's proposal.  At that meeting, each of Perella Weinberg and Morgan Stanley presented their respective valuation analyses to the Board and their opinions that the consideration offered in the Proposed Transaction was financially fair to Sagent's stockholders.  As discussed more fully herein, the Solicitation Statement fails to disclose certain information that was presented to the Board that is necessary for stockholders to make a fully informed decision with respect to the Proposed

Transaction. Following the bankers' presentations, the Board determined to approve the Proposed Transaction and authorize the execution of the Merger Agreement.

***The Merger Agreement***

47.     On July 10, 2016, the Board caused the Company to enter into the Merger Agreement, pursuant to which Sagent will be acquired for inadequate consideration.

48.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.   Section 5.3(a) of the Merger Agreement states:

> (a) The Company agrees that it shall, and shall cause its Subsidiaries and its and its Subsidiaries' respective directors and officers to, and shall use its reasonable best efforts to cause its other Representatives to, cease immediately all existing negotiations with any Person or its Representatives conducted heretofore with respect to any Takeover Proposal, immediately terminate access by any such Person or its Representative to any online data room maintained by or behalf of the Company, and promptly request that any such Person and its Representatives promptly return or destroy all confidential information concerning the Company and its Subsidiaries previously furnished to them. Except as otherwise provided in this Agreement, from the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 7.1, the Company shall not, and shall cause its Subsidiaries and its and its Subsidiaries' respective directors and officers not to, and shall use its reasonable best efforts to cause its other Representatives not to, directly or indirectly, (i) solicit, initiate, knowingly facilitate, or knowingly encourage any Takeover Proposal or the making or consummation thereof, (ii) enter into, continue or otherwise participate in any discussions (except to notify such Person of the existence of the provisions of this Section 5.3) or negotiations regarding, or furnish to any Person any non-public information in connection with or for the purpose of knowingly encouraging or facilitating, a Takeover Proposal or any proposal or offer that could reasonably be expected to lead to a Takeover Proposal, or (iii) enter into any letter of intent, acquisition agreement, agreement in principle or similar agreement with respect to a Takeover Proposal or with respect to any proposal or offer that could reasonably be expected to lead to a

Takeover Proposal.

49. Further, the Company must advise Nichi-Iko, within twenty-four hours, of any proposals or inquiries received from other parties. Section 5.3(b) of the Merger Agreement states, in relevant part:

> The Company will promptly (and in any event within 24 hours) notify Parent in writing of the receipt of any inquiries, proposals, or offers with respect to a Takeover Proposal by the Company or any of its Subsidiaries or Representatives and provide Parent with a copy of any written Takeover Proposal received (including any written agreements, arrangements, understandings, forms of agreements supplied to third parties, and any other material documents with respect to the Takeover Proposal) and a written statement with respect to any non-written Takeover Proposal or inquiry received, which statement shall include the identity of the parties making the Takeover Proposal or inquiry and the material terms thereof. The Company will keep Parent reasonably apprised in all material respects on a reasonably current basis of the status and content of any discussions regarding any Takeover Proposal with a third party.

50. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Nichi-Iko a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.3(d) of the Merger Agreement provides:

> (d) Notwithstanding anything to the contrary in this Agreement:

> (i) if the Company has received a bona fide written Takeover Proposal (which Takeover Proposal did not arise out of a breach of Section 5.3) that has not been withdrawn and the Company's Board of Directors (or a duly authorized committee thereof) determines in good faith, after consultation with its financial advisors and outside legal counsel, that such Takeover Proposal constitutes a Superior Proposal, the Company's Board of Directors (or a duly authorized committee thereof) may make a Company Adverse Recommendation Change and/or terminate this Agreement pursuant to Section 7.1(d)(ii) to accept such Takeover Proposal, if and only if (i) the Company Board (or a duly authorized committee thereof) determines in good faith, after consultation with its outside legal counsel, that the failure to make a Company Adverse Recommendation Change in response to the receipt of such Superior Proposal would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law and (ii) (A) the Company provides Parent prior written notice of its intent to take such action and terminate this Agreement pursuant to Section 7.1(d)(ii) at least five (5)

Business Days prior to taking such action, which notice shall attach the most current draft of any Company Acquisition Agreement with respect to such Superior Proposal or, if no such draft exists, a summary of the material terms and conditions of such Superior Proposal (a "Notice of Intended Recommendation Change") (it being understood that such Notice of Intended Recommendation Change shall not in itself be deemed a Company Adverse Recommendation Change and that any change in price or material revision or amendment to the terms of a Superior Proposal, if applicable, shall require a new notice to which the provisions of clauses (ii)(A), (B) and (C) of this Section 5.3(d)(i) shall apply mutatis mutandis  except that, in the case of such a new notice, all references to five (5) Business Days in this Section 5.3(d)(i) shall be deemed to refer to be three (3) Business Days); (B) during such five (5) Business Day period following Parent's receipt of the Notice of Intended Recommendation Change, the Company shall, and shall cause its financial and legal advisors and other Representatives to, negotiate in good faith with Parent (if Parent has requested that they negotiate) to make such adjustments in the terms and conditions of this Agreement that Parent proposes to make; and (C) at the end of such five (5) Business Day period and taking into account any modifications to the terms of this Agreement proposed by Parent to the Company in a written, binding and irrevocable offer, the Company Board determines in good faith (after consultation with outside legal counsel) that the failure to make such a Company Adverse Recommendation Change would reasonably be expected to be inconsistent with its fiduciary duties under applicable Law, and that such Takeover Proposal still constitutes a Superior Proposal[.]

51.     Further locking up control of the Company in favor of Nichi-Iko, the Merger Agreement provides for a "termination fee" of $23.4 million, payable by the Company to Nichi-Iko if the Individual Defendants cause the Company to terminate the Merger Agreement.

52.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

53.     Additionally, certain stockholders of the Company have entered into tender and support agreements, pursuant to which they will tender their shares in the Tender Offer. Accordingly, approximately 20% of the Company's shares are already locked up in favor of the Proposed Transaction.

54.     Certain of the Company's officers and directors stand to receive significant benefits as a result of the Proposed Transaction.  For example, Sagent's current management team will continue to lead the post-transaction company from Sagent's headquarters in Schaumburg, Illinois.

55.     The $21.75 per share consideration to be paid to plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.  For example, according to Perella Weinberg's and Morgan Stanley's own financial analyses, the Company's stock price traded as high as $26.21 per share in the past twelve months, and at least one analyst set a price target for the Company of $25.00 per share.

56.     Further, the merger consideration fails to adequately compensate the Company's stockholders for the significant synergies created by the merger.

57.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

***The Materially Incomplete and Misleading Solicitation Statement***

58.     Defendants filed the Solicitation Statement with the SEC in connection with the Proposed Transaction.  As alleged below and elsewhere herein, the Solicitation Statement omits material information that must be disclosed to Sagent's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

59.     The Solicitation Statement omits material information with respect to the process and events leading up to the Proposed Transaction, the Company's financial projections, and the opinions and analyses of Sagent's financial advisors, Perella Weinberg and Morgan Stanley.

14

This omitted information, if disclosed, would significantly alter the total mix of information available to Sagent's stockholders.

60.     For example, with respect to Perella Weinberg's Selected Publicly Traded Companies Analysis, the Solicitation Statement fails to disclose the individual EV/2017 EBITDA multiples observed by Perella Weinberg for each of the selected comparable companies, as well as any other multiples or benchmarking statistics observed by Perella Weinberg in connection with this analysis.  Also, the Solicitation Statement fails to disclose whether the debt amount used by Perella Weinberg in this analysis was adjusted for the debt resulting from the Teva acquisition.

61.     With respect to Perella Weinberg's Selected Transactions Analysis, the Solicitation Statement fails to disclose whether the debt amount used by Perella Weinberg was adjusted for the debt resulting from the Teva acquisition.

62.     With respect to Perella Weinberg's Discounted Cash Flow Analysis, the Solicitation Statement fails to disclose the Company's unlevered free cash flows ("UFCFs"), as well as the component "other cash flows," including what is included in these other cash flows as well as the actual amounts, utilized by Perella Weinberg to perform its analysis.  Additionally, the treatment of stock-based compensation expense is not disclosed in the description of Perella Weinberg's analysis.  The Solicitation Statement also fails to disclose the key inputs and assumptions underlying its weighted average cost of capital ("WACC") analysis to derive the discount rate applied in the analysis.

63.     With respect to Morgan Stanley's Precedent Transactions Analysis, the Solicitation Statement fails to disclose whether the debt amount used by Perella Weinberg was adjusted for the debt resulting from the Teva acquisition.

64.     With respect to Morgan Stanley's Discounted Cash Flow Analysis, the Solicitation Statement fails to disclose the Company's UFCFs utilized by Morgan Stanley to perform its analysis.

65.     With respect to the Prospective Financial Information, as utilized by the financial advisors, the Solicitation Statement fails to disclose underlying components of UFCF, including capital expenditures and changes in net working capital. Additionally, the Prospective Financial Information fails to disclose the timing and magnitude of the contribution of the assets acquired from Teva to the Company's expected financial results.

66.     The Solicitation Statement fails to disclose the reason the Board determined it was necessary to engage Morgan Stanley to perform the same exact duties that Perella Weinberg was hired to perform, including whether the engagement of Morgan Stanley was due to any perceived conflicts of interest on the part of Perella Weinberg.

67.     Although the Solicitation Statement indicates that Individual Defendant Yanai, a member of the Board, is an independent advisor to Perella Weinberg, the Solicitation Statement fails to disclose any further information about the nature and extent of Yanai's relationship with Perella Weinberg or whether the Board even considered this potential conflict of interest and, if so, what steps were taken to mitigate this conflict.

68.     Additionally, although the Solicitation Statement indicates that Perella Weinberg is expected to receive "approximately" $8 million upon the closing of the Proposed Transaction (in addition to the $2 million it already earned upon delivery of its fairness opinion), the Solicitation Statement fails to disclose the precise fee arrangement that Perella Weinberg and the Board agreed upon, including whether Perella Weinberg's fee structure was fixed or variable depending on the achievement of certain goals.

69. The Solicitation Statement fails to disclose whether any of the standstill provisions entered into by the Company (other than Nichi-Iko's) contains a DADW provision that is or was preventing any of the counterparties from requesting a waiver of the standstill provision to allow those counterparties to submit a higher offer for the Company.

70. The Solicitation Statement fails to disclose whether any parties (aside from Nichi-Iko) contacted Perella Weinberg or any other Company representative as a result of the January 13, 2016 *Reuters* news story to express interest in Sagent and, if so, how many parties were turned away.

## FIRST CLAIM FOR RELIEF

### (Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)

71. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72. Section 14(e) of the 1934 Act states, in relevant part, that:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

73. Defendants disseminated the misleading Solicitation Statement, which contained statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially misleading.

74. The Solicitation Statement was prepared, reviewed, and/or disseminated by defendants.

75. The Solicitation Statement misrepresented and/or omitted material facts in connection with the Proposed Transaction as set forth above.

76.     By virtue of their positions within the Company and/or roles in the process and the preparation of the Solicitation Statement, defendants were aware of this information and their duty to disclose this information in the Solicitation Statement.

77.     The omissions and misleading statements in the Solicitation Statement are material in that a reasonable shareholder will consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.   In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Solicitation Statement and in other information reasonably available to shareholders.

78.     Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

79.     By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

80.     Because of the false and misleading statements in the Solicitation Statement, plaintiff and the Class are threatened with irreparable harm.

81.     Plaintiff and the Class have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### (Claim for Violation of 14(d) of the 1934 Act Against Defendants)

82.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

83.     Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

84.     Rule 14d-9(d) states, in relevant part:

> Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

85.     The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

86.     Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and thus misleading.

87.     The omissions in the Solicitation Statement are material to plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

88.     Plaintiff and the Class have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF

**(Claim for Violation of Section 20(a) of the 1934 Act
Against the Individual Defendants and Nichi-Iko)**

89.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

90.     The Individual Defendants and Nichi-Iko acted as controlling persons of Sagent within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Sagent and participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

91.     Each of the Individual Defendants and Nichi-Iko was provided with or had unlimited access to copies of the Solicitation Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

92.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly connected with and involved in the making of the Solicitation Statement.

93.     Nichi-Iko also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Solicitation Statement.

94.     By virtue of the foregoing, the Individual Defendants and Nichi-Iko violated Section 20(a) of the 1934 Act.

95.     As set forth above, the Individual Defendants and Nichi-Iko had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their

positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

96.     As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

97.     Plaintiff and the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.      Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(e), 14(d), and 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury for all issues so triable.

Dated: August 9, 2016

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**

By: _/s/ Theodore B. Bell_

Theodore B. Bell
Carl V. Malmstrom
One South Dearborn Street
Suite 2122
Chicago, IL 60603
Tel.: (312) 984-0000
Fax: (312) 212-4401
tbell@whafh.com
malmstrom@whafh.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

Gregory M. Nespole
270 Madison Ave.
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 545-4653
nespole@whafh.com

**RIGRODSKY & LONG, P.A.**

Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
Jeremy J. Riley
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel: (302) 295-5310
Fax: (302) 654-7530
sdr@rl-legal.com
bdl@rl-legal.com
gms@rl-legal.com
jjr@rl-legal.com

_Attorneys for Plaintiff_